IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JACK BYRD | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:14-02750 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendants. | § | |

## O R D E R

Pending before the Court is Defendant Carolyn W. Colvin ("Defendant" or "Commissioner")'s Motion for Summary Judgment. **(Instrument No. 8)**. Also pending before the Court is Plaintiff Jack Byrd's ("Plaintiff" or "Byrd")'s Motion for Summary Judgment. **(Instrument No. 7)**.

### I.

### A.

Byrd brings this action to review a final order from Defendant, Commissioner of the Social Security Administration ("Administration"), pursuant to 42 U.S.C. §405(g). (Instrument No. 7 at 1). Byrd seeks reversal of the Administrative Law Judge's ("ALJ") decision denying Plaintiff disability and disability income benefits under Title II of the Social Security Act ("SSA"). (*Id.*). Byrd also seeks a remand for an award of benefits or, in the alternative, additional administrative proceedings. (*Id.* at 10).

**B.**

Byrd filed for disability benefits under the SSA on December 29, 2011 to establish a period of disability and disability insurance benefits beginning on December 29, 2009. (Instrument No. 5-6 at 2-10). Byrd's claim was initially denied on February 16, 2012, and denied again upon reconsideration on April 5, 2012. (Instrument No. 5-3 at 3-5). Plaintiff requested an administrative hearing before an ALJ on April 23, 2012. (Instrument No. 5-4 at 12-14). The administrative hearing was held before Judge Daniel Whitney on May 8, 2013. (Instrument No. 5-2 at 24-59). On May 23, 2013, the ALJ found Byrd was not disabled. (Instrument No. 5-2 at 9-23). On July 22, 2013, Byrd requested a review of the ALJ's decision. (Instrument No. 5-2 at 7-8). On July 16, 2014, the Appeals Council denied Byrd's request. (Instrument No. 5-2 at 1-6). Pursuant to his right to judicial review, Byrd filed this action under 42 U.S.C. § 405(g). (Instrument No. 7 at 3)

**C.**

<u>1.</u>

Byrd was born on June 13, 1959, and was 50 years old at the onset of his alleged disability. (Instrument No. 5-6 at 2-4). Byrd testified that he received a GED. (Instrument No. 5-2 at 34). Byrd has not engaged in substantial gainful activity since December 29, 2009. (Instrument No. 5-2 at 15). Prior to that, Bryd was a self-employed carpenter. (Instrument No. 5-6 at 27).

<u>2.</u>

Byrd has a history of low back, neck and shoulder pain. (Instrument 5-7 at 6). According to Byrd the pain began after he was electrocuted 20 years ago. (*Id.*). Three years ago, Byrd

claims that he fell off a twelve foot tall dam. (*Id.*). Byrd claims the fall, increased his neck, shoulder and back pain. (*Id.*).

On July 18, 2011, Byrd was examined by Dr. Travis Garrett ("Dr. Garrett") to assess Byrd's low back, neck, and shoulder pain. (*Id.* at 37). Dr. Garrett found that Byrd's neck and back pain is likely osteoarthritis[1] and musculoskeletal[2]. (*Id.*). Dr. Garret also sugguested Byrd's shoulder pain is likely adhesive capsulitis,[3] also known as frozen shoulder. (*Id.*).

On July 19, 2011, Dr. Garret performed X rays on Byrd's shoulder, neck and back. (*Id.* 5-7 at 43). A left shoulder X ray showed a mild arthrosis of the glenohumeral[4] and acromioclavicular[5] joints; calcific tendinosis[6]; and narrowing of the acromiohumeral interval[7] suggesting rotator cuff pathology. (*Id.*). A cervical X ray showed advanced multilevel degenerative changes of the cervical spine. (*Id.*). Thoracic and Lumbosacral X rays revealed mild multilevel degenerative changes of the thoracic and lumber spine. (*Id.*)

---

[1] Osteoarthritis is the most common form of arthritis, affecting millions of people worldwide. It occurs when the protective cartilage on the ends of your bones wears down over time. http://www.mayoclinic.org/diseases-conditions/osteoarthritis/basics/definition/con-20014749 (last visited June 12, 2015).

[2] Musculoskeletal is pain that affects the bones, muscles, ligaments, tendons, and nerves. http://my.clevelandclinic.org/health/diseases_conditions/hic_musculoskeletal_pain (last visited June 12, 2015).

[3] Adhesive capsulitis is a condition characterized by stiffness and pain in your shoulder joint. http://www.mayoclinic.org/diseases-conditions/frozen-shoulder/basics/definition/con-20022510 (last visited June 12, 2015).

[4] Glenohumeral joint is the shoulder joint, formed by the glenoid cavity of the scapula and the head of the humerus. http://medical-dictionary.thefreedictionary.com/glenohumeral+joint (last visited June 12, 2015).

[5] Acromioclavicular joint is the joint plane between the medial margin of the acromion of the scapula and the lateral margin of the clavicle. http://medical-dictionary.thefreedictionary.com/acromioclavicular+joint (last visited June 12, 2015).

[6] *Calcific tendonitis* is the Inflammation of a tendon accompanied by focal calcium deposits, especially common in the supraspinatus tendon of shoulder joint. http://medical-dictionary.thefreedictionary.com/Calcific+tendonitis (last visited June 12, 2015).

[7] Acromiohumeral interval (AHI) is a useful and reliable measurement on AP shoulder radiographs and when narrowed is indicative of rotator cuff tear or tendinopathy. http://radiopaedia.org/articles/acromiohumeral-interval (last visited June 12, 2015).

On August 15, 2011, Byrd was examined by Dr. Ruth Falik ("Dr. Falik"). (Instrument 5-7 at 31). Dr. Falik agreed with Dr. Garret's exam results and with the diagnosis of chronic transaminitis and back pain. (*Id.* at 34). Dr. Falik noted that Byrd continues to suffer from pain in his shoulders and lower pack. At the time, Byrd was taking Advil for his pain. (*Id.*).

On October 18, 2011, Byrd was examined by Dr. Jamie Partridge ("Dr. Partridge") (*Id.* at 31). Dr. Jamie Partridge found that the pain in Byrd's shoulder and neck had subsided and that his shoulder flexibility was improving. (*Id.*). On November 1, 2011, Byrd was again examined by Dr. Partridge. (*Id.* at 26). At that time, Dr. Partridge found that Byrd had increased pain when he moved his neck and shoulders. (*Id.*).

On November 14, 2011, Byrd was examined by Dr. Travis Garrett ("Dr. Garrett"). (*Id.* at 20). Dr. Garrett found that physical therapy was improving Byrd's bodily movement but that he still suffered from chronic neck, shoulder and back pain. (*Id.* at 23).

On December 19, 2011, Dr. Garrett again examined Byrd. (*Id.* at 8). Dr. Garrett assessed chronic neck, shoulder and back pain, most likely secondary trauma, osteoarthritis, severe degenerative joint disease, and frozen shoulder. (*Id.* at 11). Dr. Garrett also found that Byrd had a decreased range of motion in his neck and shoulders. (*Id.*).

On January 13, 2012, Byrd reported to Dr. Partridge that he was having increased lower back pain after he "twisted funny". (*Id.* at 6). Byrd again complained of low back pain, shoulder pain and neck pain. (*Id.*) He reported that his pain decreased with manual therapy. (*Id.*) He was advised to continue physical therapy once a week for six weeks for strengthening, range of motion, and improved function in daily activities. (*Id.*)

On March 29, 2012, Dr. Garrett completed a lumber spine medical source statement. (Instrument 5-8 at 33.). Dr. Garrett diagnosed Byrd with chronic back, neck and shoulder pain. (*Id.*). Dr. Garrett indicated Byrd had a fair prognosis and that Byrd had a decreased range of motion in his neck and bilateral shoulders and a positive straight leg raising test on the left. (*Id.*). Dr. Garrett found that Byrd had neck and low back pain during prolonged standing and sitting. (*Id.*). Dr. Garrett further recognized that Byrd was able to walk one-fourth block without having severe pain; sit for twenty minutes at one time before needing to get up; stand for ten minutes at one time before he needs to sit down; lift and carry less than ten pounds occasionally. (*Id.*). Dr. Garret concluded Byrd could sit for about four hours and stand/walk for less than two hours in a working day. (*Id.*). He indicated Byrd would need a job that permits shifting positions at will from siting, standing or walking. (*Id.* at 35). Specifically, Dr. Garrett indicated that Byrd would need to be able to shift positions at will and walk around every five minutes for ten minutes. (*Id.*). Dr. Garrett indicated that Byrd would need to take five or more unscheduled breaks per day and that Byrd would need to rest 15-20 minutes before returning to work. (*Id.*). Dr. Garrett concluded that Byrd should use a cane when walking or standing. (*Id.*). He also determined that in work situations, Byrd can occasionally carry objects that are less than ten pounds. (*Id.*). Dr. Garret indicated Byrd would be able to occasionally twist, crouch/squat, and climb stairs but that Byrd should not bend and should rarely climb ladders. (*Id.*). Dr. Garret indicated Byrd would be limited to performing fine manipulation seventy percent of the time and reaching in front of his body thirty percent of the time. (*Id.* at 36). Dr. Garret concluded Byrd is likely to be off task 25 percent or more of his time working and that Byrd would likely have to miss more than four days a month of work. (*Id.*).

On May 14, 2012, Dr. Falik assessed Byrd with severe spinal stenosis[8] in the cervical region. (*Id.* at 10). Foraminal stenosis was performed from C3 through C7. (*Id.*). It was severe at C3-C4 on the right, C4-C5 on the right and at C5-C6 on the left. Disc ostephyte complexes from C3 through C6 resulted in mild spinal canal stenosis, which was worst at C5-C6. (*Id.*). Moderate spinal canal stenosis at L3-L4 due to disc protrusion with a small central annular fissure. (*Id.*). Mild bilateral forminal stenosis at L3-L4 due to disc bulge and facet arthropathy. (*Id.*). Focal left paracentral disc extrusion which abuts the S1 nerve root at L5-S1 (*Id.*). Facet arthropathy and synovitis at L3-L4. Annular fissure with the L3-L4 intervertebral disc. (*Id.*).

### D.

#### 1.

On May 8, 2013, the ALJ conducted an administrative hearing on Byrd's claims for disability benefits. (Instrument No. 5-2 at 13). Attorney Frank Marek ("Mr. Marek") represented Byrd. (*Id.*) Vickie Colenburg ("Ms. Colenburg") testified as a vocational expert ("VE"). (*Id.*). In determining whether Byrd was disabled under the Act, the ALJ applied the five-step sequential evaluation process required by the SSA. At step 1, the ALJ found that Byrd had not engaged in substantial gainful activity since December 29, 2009. (Instrument No. 5-2 at 14). The ALJ further determined, at step 2, that Byrd had the following severe impairments: low back pain; degenerative disc disease; frozen shoulder; deconditioning secondary to long-time unemployment (*Id.*). At step 3, the ALJ concluded that Byrd did not have any impairments or combination of impairments that met or medically equaled the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

---

[8] Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back. http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited June 12, 2015).

Prior to reaching step four, the ALJ determined that Byrd has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b) except Byrd would be unable to climb ropes, ladders, or scaffolds or perform overhead reaching. (*Id.* at 14-15).

At step four, the ALJ found Byrd has no relevant work. (*Id.* at 18). At step five, the ALJ considered Byrd's age, education, work experience, and RFC, and found there were jobs that existed in significant numbers in the national economy that Byrd could perform despite his limitations. (*Id.*). The ALJ relied on the testimony of Ms. Colenburg who testified that Byrd could perform the jobs of small product assembler, price tagger and cafeteria attendant (*Id.* at 20). Based on the foregoing, the ALJ found Byrd is not disabled under the Act. (*Id.*)

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" it its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." (*Id.* at 248). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. (*Id.*). If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. (*Id.* at 249-50).

Under Fed. R. Civ. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).

Where the nonmoving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts...the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-87 (quoting Fed. R. Civ. P. 56(c)). To sustain the burden, the nonmoving party must produce evidence admissible at trial. *Anderson*, 477 U.S. at 255. In deciding a summary judgment motion, "[t]he evidence of the nomovant is to be believed, and all justifiable inferences are to be drawn in his favor." (*Id.* at 255). If reasonable minds can differ regarding a genuine issue of material fact, summary judgment should not be granted. (*Id.* at 250-51).

When applying the summary judgment standard to the ALJ's decision to deny benefits, the Court may only inquire into: (1) whether the proper legal standard was applied; and (2) whether substantial evidence supports the decision. *Joseph v. Astrue*, 231 Fed. Appx. 327, 329 (5th Cir. 2007) (unpublished). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992) (citing 42 U.S.C. § 405(g)); *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

Substantial evidence requires "more than a mere scintilla" of evidence. *Joseph*, 231 Fed. Appx. at 329 (citing *Richardson*, 402 U.S. at 401). Alternatively, substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (*Id.*).

A determination as to whether there is substantial evidence in the record to support the findings of the Commissioner does not involve reweighing the evidence, trying the issues *de novo*, or substituting the judgment of this Court for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (1994) (citing *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989)). Instead, this Court must scrutinize the record in its entirety to determine whether substantial evidence supports the Commissioner's findings. *(Id.)*.

### III.

A claimant is entitled to disability benefits if he establishes that he is unable to engage in, "any substantial gainful activity by reason of any medically determinable physical or mental impairment…which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A) (2008). In determining whether a claimant is capable of engaging in any substantial gainful activity, the Commissioner applies a five-step sequential evaluation process.

The rules governing the steps of this evaluation process are: (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a severe impairment; (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found not disabled; and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and RFC

must be considered to determine whether he can do other work. *Boyd v. Apfel*, 239 F.3d 698, 704-05 (5th Cir. 2001); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

"A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Boyd*, 239 F.3d at 705 (quoting *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)). When a claimant's impairments do not meet the requirements of step 3, the Commissioner will still evaluate the claimant's RFC to determine if she can do her past work. 20 C.F.R. § 404.1520 (2012). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at step five. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

Following the 2013 hearing in this case, the ALJ found that Byrd was not disabled at step 5 of the evaluation process. (Instrument No. 5-2 at 24-59). The Commissioner's decision became final on July 16, 2014, when the Appeals Council denied Byrd's appeal of the 2013 hearing decision. (*Id.* at 7). Byrd's appeal to this Court concerns the ALJ's determination at step 3 and of his RFC (Instrument No. 9 at 2). At step 3, the ALJ determined that Byrd does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (*Id.*). Before reaching step four, the ALJ considered opinion evidence from Dr. Garrett in assessing Byrd's RFC. At step 5, the ALJ relied upon a vocational expert testimony, Vickie Colenburg, to find Byrd could perform certain jobs despite the limitations described in his RFC. (*Id.*).

Byrd cites two errors in support of his motion for summary judgment. First, Byrd argues that the ALJ erred when he failed to consider that Byrd's diagnosis of Spinal stenosis precluded

him from light work or the ability to work a full day. (Instrument No. 7 at 6). Performing light work requires the ability to lift more than twenty pounds at a time. Light work also requires the ability to frequently lift or carry objects that weigh ten pounds. 20 CFR 404.1567 (b). Light work requires one to walk or stand for the majority of the workday. (*Id.*). The claimant has the burden of proving he can not perform light work or work a full day. *Newton*, 209 F.3d at 453. The ALJ has a duty to consider all evidence and may not pick and choose evidence that suit them. *Loza v. Apfel*, 219 F.3d 394 (5th Cir. 2000).

In support of his first argument, Byrd cites a May 14, 2012 visit to Dr. Garrett during which Dr. Garrett diagnosed Byrd as suffering from Spinal stenosis in cervical region. (Instrument 5-8 at 10). Byrd cites an MRI performed on him by Dr. Garrett which revealed Byrd has severe damage to his spine. (*Id.*). Dr. Garrett referred Byrd to Neurosurgery and to consider other options. (*Id.* at 12). While Dr. Garrett assessed Byrd with Spinal stenosis there is no evidence that Spinal stenosis would prevent Byrd from performing light work or rendered Byrd disabled. (Instrument 5-8 at 1-37). Spinal stenosis is not an impairment listed in the CFR. *See* 20 CFR Part 404, Subpart P, Appendix 1. Furthermore while Dr. Garrett recommended Byrd to neurosurgery, Byrd's claim that Spinal stenosis precludes light work is not supported by the record. Accordingly, Byrd failed to meet his burden to show the ALJ that Spinal Stenosis is a severe impairment or would preclude light work. *See Newton*, 209 F.3d at 453.

Byrd also argues that the ALJ incorrectly ruled that Dr. Garrett's opinion was not entitled to controlling weight when determining his RFC. (Instrument No. 7 at 7). A treating physician's opinions are not conclusive and are not entitled to controlling weight if substantial, non medical evidence shows that the individuals activities are greater than those provided in the treating

source's opinion. *Nix v. Barnhart*, 160 F. App'x 393, 395-396 (5th Cir. 2005). The ALJ is free to assign little or no weight to the opinion of any physician for good cause. *Newton*, 209 F.3d at 455-56. Good cause arises where statements are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *Newton*, 209 F.3d at 456.

Byrd asserts that Dr. Garrett's opinion should be the controlling evidence used to determine his disability. Byrd cites a March 29, 2012 visit to Dr. Garrett during which Dr. Garrett drafted a lumber spine medical source statement. (Instrument 5-8 at 33.) He assessed Byrd as being able to: walk one-fourth block without having severe pain; sit for twenty minutes at one time before needing to get up; stand for ten minutes at one time before he needs to sit down; and lift and carry less than ten pounds occasionally. (*Id.*). Dr. Garret reported Byrd should not carry anything that weighs more than 10 pounds. (*Id.*). Dr. Garret indicated Byrd needs to be able to shift positions at will and walk around every five minutes for ten minutes. (*Id.* at 35). Dr. Garrett concluded Byrd needs to take five or more unscheduled breaks per day. (*Id.*). Dr. Garret indicated Byrd is likely to be off task 25 percent or more of his time working and will likely have to miss more than four days a month of work. (*Id.*).

Dr. Garrett's opinions are directly controverted by Byrd's own testimony. Byrd testified that he could lift twenty pounds. (Instruments No. 5-2 at 42). Byrd further testified that he could sit long enough to drive his elderly housemates to and from medical appointments and that he could walk more than two blocks. (*Id.* at 30,51). The ALJ noted that Byrd had no difficulty sitting in the administrative hearing, which lasted thirty-four minutes. (Id. at 26-58). Byrd also stated that he cared for elderly people that lived with him and his pet cat. (*Id.* at 32). Byrd did not

seek regular treatment for his alleged impairments and only took Advil to alleviate his pain, indicating that his pain was not severe. (*Id.* at 17, 43). Byrd was also able to complete strength exercises in physical therapy. (Instrument 5-7 at 34). Dr. Garrett's opinions of Byrd's limited capabilities are not consistent with Byrd's testimony as a whole. Accordingly, there is substantial evidence that supports the ALJ's decision that Dr. Garrett's opinion is not entitled to controlling weight. See *Nix*, 160 F. App'x at 395-396.

For these reasons, the Court concludes that substantial evidence supports the Commissioner's ultimate finding that Byrd was not disabled.

### IV.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (**Instrument No. 8**) is **GRANTED** and Plaintiff's Motion for Summary Judgment (**Instrument No. 7**) is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 2nd day of July, 2015, at Houston, Texas.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE